[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 22-11072

_____

SOUL QUEST CHURCH OF MOTHER EARTH,
INC.,
a Florida Domestic Non-Profit Corporation,
on its own behalf and on behalf of its
members,
CHRISTOPHER YOUNG,
individually and as spiritual leader of
Soul Quest Church of Mother Earth, Inc.,

Plaintiffs-Appellants,

*versus*

ATTORNEY GENERAL, UNITED STATES OF
AMERICA,
ADMINISTRATOR, U.S. DRUG ENFORCEMENT

2                    Opinion of the Court                    22-11072

ADMINISTRATION,

                                                    Defendants-Appellees,


ACTING ADMINISTRATOR, U.S. DRUG
ENFORCEMENT ADMINISTRATION,
U.S. DRUG ENFORCEMENT ADMINISTRATION,

                                                            Defendants.


                    _____

                Appeal from the United States District Court
                    for the Middle District of Florida
                D.C. Docket No. 6:20-cv-00701-WWB-DCI

                    _____

Before JILL PRYOR, NEWSOM, and GRANT, Circuit Judges.

JILL PRYOR, Circuit Judge:

        This appeal requires us to decide whether the Drug Enforce-
ment Administration's ("DEA") denial of a church's petition for a
religious exemption to the Controlled Substances Act ("CSA")[1] was

_____

[1] Title II of the Comprehensive Drug Abuse Prevention and Control Act of
1970, Pub. L. No. 91-513, 84 Stat. 1242, contains the statutory provisions
known as the Controlled Substances Act, 21 U.S.C. §§ 801–971.

a decision made under the CSA's Control and Enforcement sub-chapter.[2] The answer to this question determines whether the church's complaint—seeking judicial review of the DEA's denial and raising additional constitutional, statutory, and procedural challenges—was filed in the wrong federal court. Simply put, this appeal concerns the district court's subject matter jurisdiction to hear the church's case.

The CSA's Control and Enforcement subchapter prohibits the unauthorized handling of the controlled substances identified in the statute. For individuals and organizations who wish to handle controlled substances for religious purposes, the CSA conflicts with the Religious Freedom Restoration Act ("RFRA").[3] RFRA prohibits a federal agency like the DEA from burdening an individual's free exercise of sincerely-held religious beliefs unless the agency can show that the burden advances a compelling governmental interest and is carried out with the least restrictive means. 42 U.S.C. § 2000bb-1(b). Aware of this conflict, the DEA prompted Soul Quest Church of Mother Earth, Inc. ("Soul Quest") to submit a petition for a religious exemption to the CSA so that Soul Quest could legally use and handle a sacramental tea known as ayahuasca,

---

[2] The Control and Enforcement subchapter contains the statutory provisions governing the DEA's authority to control certain substances; requiring the registration of manufacturers, distributors, and dispensers of controlled substances; and setting forth the offenses and penalties for handling controlled substances without authorization. 21 U.S.C. §§ 801–904.

[3] 42 U.S.C. §§ 2000bb-1–4.

which contains a controlled substance, dimethyltryptamine ("DMT").

Following the DEA's guidance, Soul Quest submitted a petition containing information about the church's religious beliefs and practices, as well as its usage and storage of ayahuasca. In response to Soul Quest's petition, the DEA conducted a fact-finding investigation, which included interviews of church members and an onsite inspection of the storage unit for the sacramental tea. Following its investigation, the DEA denied Soul Quest's request for an exemption to the CSA. The agency concluded that the church had not met its burden under RFRA to show that its members' beliefs were sincerely held and that its use of ayahuasca was part of a religious exercise. In addition, the DEA found compelling governmental interests in maintaining public safety and preventing diversion of the tea into improper channels. And it found that the CSA's prohibitions furthered those compelling interests with the least restrictive means. The DEA noted that its decision was a final determination made under 21 U.S.C. § 877.

Of critical importance here, 21 U.S.C. § 877 requires a party aggrieved by a final decision[4] made under the CSA's Control and Enforcement subchapter to obtain judicial review from an

---

[4] In this appeal, Soul Quest does not argue that the DEA's order was not a final decision. It does, however, advance that argument in a separate appeal pending before this Court. *See infra* note 19. Because Soul Quest does not advance the argument in this case, we assume for purposes of this appeal that the DEA's decision was indeed final.

appropriate federal circuit court of appeals—not a federal district court. But Soul Quest did not seek judicial review in a circuit court of appeals. Instead, the church and its spiritual leader, Christopher Young,[5] sought judicial review of the DEA's[6] decision by amending an earlier complaint it had filed in a federal district court. The district court dismissed Soul Quest's complaint, concluding that under § 877 the court lacked subject matter jurisdiction over Soul Quest's claims.

Soul Quest appeals the district court's dismissal. It argues that the district court had jurisdiction because the DEA's final decision was not made under the CSA. According to Soul Quest, the agency lacked the authority to adjudicate the church's request for a religious exemption because the issue was controlled instead by RFRA. And, it argues, RFRA requires the DEA's decision to be vacated.

After careful consideration, and with the benefit of oral argument, we conclude that the DEA's denial of Soul Quest's exemption request was a decision made under the CSA's Control and Enforcement subchapter. Importantly, our conclusion that the DEA decided Soul Quest's petition under the CSA does not mean that

---

[5] Soul Quest brought this suit on its own and on behalf of its members, joined by Christopher Young, individually and as spiritual leader of Soul Quest. For simplicity's sake, we refer to the plaintiffs collectively as "Soul Quest."

[6] Soul Quest and Young named as defendants the Attorney General of the United States and the Administrator of the DEA. For simplicity's sake, we refer to the defendants collectively as the "DEA."

the petition was not also decided under RFRA. Certainly, the DEA had to evaluate Soul Quest's petition using the standard RFRA established. But the object of the petition was to allow Soul Quest to handle ayahuasca legally under the CSA. Because the decision was made under the CSA, the district court lacked subject matter jurisdiction to review the denial on the merits. And because Soul Quest's additional constitutional, statutory, and procedural claims raised in its operative complaint were "inescapably intertwined"[7] with the DEA's final decision, the CSA's jurisdictional bar also applied to those claims. We therefore affirm the district court's dismissal of Soul Quest's claims for lack of subject matter jurisdiction.

## I.      BACKGROUND

In this section, we begin by describing the CSA's requirements for obtaining permission to handle a controlled substance. Next, we outline Soul Quest's desired use of ayahuasca and its petition for a religious exemption to the CSA. We then turn to its initial lawsuit against the DEA in district court and the DEA's

---

[7] As we discuss further below, a claim that is inescapably intertwined with the review of an agency order amounts to an impermissible collateral challenge to the order. *See Green v. Brantley*, 981 F.2d 514, 521 (11th Cir. 1993).

ultimate denial of Soul Quest's petition. We finish with a review of the litigation that followed.

## A.  The CSA's Regulation of Controlled Substances and the Registration Process for Obtaining Permission to Handle a Controlled Substance

Before turning to the central issue in this appeal, we must first understand how the CSA works. The CSA establishes a unified legal framework for regulating drugs that are deemed to pose a risk of abuse and dependence. These drugs are referred to as "controlled substances." Controlled substances are classified into five distinct schedules based on their acceptable legitimate medical uses and abuse or dependency potential. 21 U.S.C. § 812(b). Schedule I drugs have no current accepted medical use and have a high potential for abuse. *Id.* § 812(b)(1).

The CSA recognizes that the "illegal importation, manufacture, distribution, and possession and improper use of controlled substances" can have a "detrimental effect on the health and general welfare" of the public. *Id.* § 801(2). Accordingly, the statute makes it generally unlawful to handle[8] a controlled substance, such as DMT. *Id.* §§ 841(a)(1), 844(a). A person who violates the CSA by

---

[8] We use the verb "handle" as shorthand for various activities the CSA prohibits. The CSA generally makes it "unlawful for any person knowingly or intentionally to possess a controlled substance." 21 U.S.C. § 844(a). It is a separate crime for any person to knowingly or intentionally "manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." *Id.* § 841(a).

unlawfully handling a controlled substance faces fines, imprisonment, or both. *See id.* §§ 841(b), 844(a).

The CSA recognizes, however, that "[m]any" controlled substances "have a useful and legitimate medical purpose and are necessary to maintain the health and general welfare" of the public. *Id.* § 801(1). To that end, the CSA provides a process by which a person may be permitted to "possess, manufacture, distribute, or dispense" controlled substances without violating the statute. *Id.* § 822(b). To obtain this permission, the person must "obtain annually a registration issued by the Attorney General in accordance with the rules and regulations promulgated by" the Attorney General. *Id.* § 822(a)(1). An applicant for registration cannot handle a controlled substance until the application has been granted and a Certificate of Registration has been issued by the DEA Administrator.[9] 21 C.F.R. § 1301.13.

An entity[10] that applies for a registration must provide its business information; denote a business activity (for example,

---

[9] Although the CSA provides that the Attorney General issues registrations, the Attorney General has delegated this responsibility to the DEA Administrator. *See* 21 U.S.C. § 821; 28 C.F.R. § 0.100(b).

[10] The CSA requires a "person" to obtain a registration, but it does not define the term "person." *See* 21 U.S.C § 822(a)(1). The Dictionary Act defines "person" to include "corporations" and "companies." 1 U.S.C. § 1. The Dictionary Act specifies that courts should use this definition "[i]n determining the meaning of any Act of Congress, unless the context indicates otherwise." *Id.*; *see Return Mail, Inc. v. U.S. Postal Serv.*, 139 S. Ct. 1853, 1862 (2019). Because

manufacturing, distributing, or dispensing) and the schedule of controlled substances that the business activity concerns; provide any state licenses or registrations; disclose past convictions concerning controlled substances; and submit the required payment. In evaluating the application, the DEA may require the applicant to submit additional documents or written statements of fact the agency deems necessary to determine whether a Certificate of Registration should issue. *Id.* § 1301.15. For example, the DEA may require the applicant to identify the source of any imported materials necessary to manufacture the controlled substance or to advise where and how the controlled substance will be stored. The DEA also may inspect the premises where the controlled substance will be used or stored and gather other information to determine whether to grant a Certificate of Registration. 21 U.S.C. § 822(f); 21 C.F.R. § 1301.31.

In deciding whether to issue a Certificate of Registration, the DEA considers whether the requested registration is consistent with the public interest. *See* 21 U.S.C. § 823(a). To evaluate the public interest, the DEA considers various factors, including: (1) the need to maintain effective control against diversion of the controlled substances into non-legitimate channels; (2) the applicant's compliance with applicable state and local law regarding use of the controlled substance; (3) whether the applicant has any prior

---

nothing in the context of the CSA indicates that a "person" should not include a corporation like Soul Quest, we conclude that Soul Quest qualifies as a person.

convictions relating to controlled-substance manufacture, distribution, or dispensing; (4) the applicant's past experience in manufacturing controlled substances; and (5) other factors that "may be relevant to and consistent with the public health and safety." *Id.* If the application is approved, the applicant will be granted a Certificate of Registration authorizing it to "possess, manufacture, distribute, or dispense controlled substances . . . to the extent authorized by [its] registration and in conformity" with the CSA. *Id.* § 822(b).

In 2006, the Supreme Court decided *Gonzales v. O Centro Espirita Beneficiente Uniao do Vegetal*, 546 U.S. 418 (2006). The Court held in *O Centro* that that the government failed to demonstrate (at the preliminary injunction stage) a compelling interest in barring a church's use of a sacramental tea containing DMT. *Id.* at 439. In so holding, the Court rejected the DEA's argument that the CSA's regulatory regime "admits of no exceptions." *Id.* at 431. The DEA recognized afterward that *O Centro* required it to "engage in a 'case-by-case consideration of religious exemptions to [the CSA]' so that it may 'strike sensible balances' of interests" based on desired religious uses of controlled substances. Doc. 13-3 at 2[11] (quoting *O Centro*, 546 U.S. at 436, 439 (2006)). Put another way, the DEA must reconcile the CSA and RFRA. To aid in this reconciliation, the DEA developed a process for petitioning for a religious exemption to the CSA. With the petition process, the DEA created a means for

---

[11] "Doc." numbers refer to district court docket entries.

evaluating petitioners' RFRA rights within the CSA's regulatory framework.

A DEA document entitled *Guidance Regarding Petitions for Religious Exemption from the [CSA] Pursuant to the [RFRA]* ("RFRA Guidelines") set forth a two-step process for obtaining a religious exemption.[12] The RFRA Guidelines instructed exemption-seekers on the submission and content of a petition for a religious exemption. But they also warned that an approved petition was not all that was necessary to permit an exemption-seeker to handle a controlled substance free from CSA enforcement. The petition was the first step, a prerequisite to obtaining permission to handle a controlled substance. Even if the DEA granted its petition, an exemption-seeker must continue to refrain from engaging in "any activity prohibited under the [CSA] or its regulations" until it has "applied for and received" a Certificate of Registration. Doc. 13-3 at 5.[13]

---

[12] The DEA sent Soul Quest a copy of the 2016 version of the RFRA Guidelines. The agency updated the RFRA Guidelines in 2018 and in 2020. But the revisions to the guidelines are immaterial to this appeal.

[13] We note that the DEA has the authority, under 21 U.S.C. § 822(d), to waive the registration requirement for manufacturers, distributors, and dispensers of controlled substances when waiver is "consistent with the public health and safety." Section 822(d) provides that the "[DEA] may, by regulation, waive the requirement for registration . . . ." The implementing regulation, 21 C.F.R. § 1307.03, allows "any person" to "apply for an exception to the application" of any of the CSA's registration regulations. Soul Quest never requested a waiver of, or an exception to, the CSA's registration provision or its attendant regulations.

According to the RFRA Guidelines, the petitioner "should provide as much information as [it] deems necessary to demonstrate that application of the [CSA] to the party's activity would (1) be a substantial burden on (2) [its] sincere (3) religious exercise." *Id.* The guidelines specified that a record demonstrating such a burden should include detailed information about the following:

> (1) the nature of the religion . . . ; (2) each specific religious practice that involves the manufacture, distribution, dispensing, importation, exportation, use, or possession of a controlled substance; (3) the specific controlled substance that the party wishes to use; and (4) the amounts, conditions, and locations of its anticipated manufacture, distribution, dispensing, importation, exportation, use, or possession.

*Id.*

## B.    Soul Quest's Use of Ayahuasca and Its Petition for a Religious Exemption to the CSA

Soul Quest is a Florida-based non-profit corporation whose members practice, as Soul Quest describes it, a "Christian syncretic religion" and use a plant-based psychedelic, ayahuasca, consumed as a sacramental tea. Doc. 59 at 2. Ayahuasca contains DMT, which the CSA lists as a Schedule I controlled substance, making it generally illegal to handle or use. 21 U.S.C. § 812(c), Schedule I(c)(6).

In 2016, the DEA became aware that Soul Quest was offering, through its website, religious retreats where it provided ayahuasca to retreat participants. The website advised potential retreat

participants that its provision of ayahuasca at the retreats was law-ful because the substance was "exempt from federal controlled substances laws." Doc. 13-3 at 2.

The DEA saw things differently, however. In August 2016, the agency sent Soul Quest a letter reminding the church that aya-huasca contained DMT, making ayahuasca's importation and dis-tribution illegal except as authorized by law.

The DEA's letter informed Soul Quest that it may qualify for an exemption to the CSA based on RFRA. The letter explained that RFRA prohibited the DEA from substantially burdening Soul Quest's religious exercise unless the agency could show that apply-ing the burden to Soul Quest was in furtherance of a compelling governmental interest and the least restrictive means of furthering that compelling interest. Along with its letter, the DEA provided Soul Quest with a copy of the RFRA Guidelines.

About a year after receiving the DEA's August 2016 letter containing the RFRA Guidelines, Soul Quest, through its attorney, submitted a petition for a religious exemption to the CSA. The pe-tition sought an exemption to the CSA "specifically as it pertain[ed] to the ritual use by Soul Quest of ayahuasca for its sacramental ac-tivities." Doc. 59-10 at 2. The petition described Soul Quest's reli-gious principles and purpose; its sacramental use of ayahuasca; the safety, security, and storage protocols for Soul Quest's ayahuasca ceremonies; and its governance and leadership structure.

**C.    Soul Quest's Initial Lawsuit in District Court and the DEA's Denial of Its Request for an Exemption to the CSA**

The DEA initially did not respond to Soul Quest's petition. After three years with no response from the DEA, Soul Quest filed a complaint against the DEA in federal district court and an accompanying motion seeking declaratory and injunctive relief. Soul Quest claimed that through the DEA's failure to respond to its petition, the agency violated its right to the free exercise of religion and its rights under RFRA. Soul Quest also filed a motion for a preliminary injunction, seeking an order prohibiting the DEA from arresting, prosecuting, or threatening Soul Quest or its members for importing, distributing, or ingesting the sacramental tea. This action apparently got the DEA's attention[14] because, soon after, the DEA responded to Soul Quest with an undated letter confirming receipt of the petition.

In the undated letter, the DEA referred to its RFRA Guidelines, stating that through the exemption request process "the DEA [could] grant appropriate registrant status to religious applicants, thus bringing the religious use of the controlled substance within the CSA's comprehensive regulatory scheme." Doc. 59-3 at 3. The

_____

[14] Although neither the CSA nor the RFRA Guidelines indicate a timeframe in which a petitioner can expect a response to a religious exemption request, we note that it took three years and a federal lawsuit for the DEA to respond to a petition it requested in the first place. By contrast, the DEA's regulations generally entitle an applicant seeking an exemption for research purposes to a determination within 21 days. *See* 21 C.F.R. § 1301.32. The DEA has provided no explanation for the long delay in responding to Soul Quest.

agency requested additional information from Soul Quest pertaining to its organization and belief system and its storage, procurement, distribution, and disposal of ayahuasca. The letter also advised Soul Quest that the DEA would need to interview the individuals in charge of the "security, recordkeeping, storage, and the dispensing" of ayahuasca as well as conduct site visits and inspections of Soul Quest's premises. *Id*. at 5.

Shortly afterward, the United States Department of Justice ("DOJ") and Soul Quest seemingly reached an agreement on the procedures for handling Soul Quest's exemption request. In June 2020, the DOJ sent a follow-up letter memorializing their discussions. Soul Quest agreed to stay its litigation against the DEA and to withdraw its motion for a preliminary injunction.[15] In return, the DEA committed to responding to Soul Quest within 14 days of receiving the information it had requested in its previous communication (the undated letter confirming receipt of Soul Quest's petition). And the agency committed to providing Soul Quest with a final decision on its petition within 75 days after the completion of the factfinding process.

The DOJ's letter noted that Soul Quest had requested additional information regarding the "DEA pre-registration

---

[15] Upon a joint motion by both parties, the district court stayed all court proceedings for 120 days "to allow Defendants to conduct a factual investigation of Plaintiffs' claims and potentially resolve the underlying dispute." Doc. 24 at 1.

investigation process." Doc. 59-4 at 3. The DOJ, on behalf of the DEA, relayed the following information explaining the registration process:

> Registration is essential to the comprehensive regulatory scheme established by the [CSA], 21 U.S.C. §§ 801 *et seq.* Under the CSA, the Attorney General, who has delegated this authority to [the] DEA, must register an applicant to distribute or manufacture a Schedule I controlled substance unless it is determined that registration would be inconsistent with the public interest. *Id.*, § 823(b). In determining the public interest, several factors must be considered, including, but not limited to, whether the applicant will maintain effective controls against diversion of the particular controlled substance into illicit channels and will be compliant with applicable state and federal laws and regulations. *Id.* DEA Diversion Investigators ("DIs") therefore routinely review applications for registration, including applications from doctors, pharmacies, distributors, importers/exporters, or manufacturers, gather relevant information, and inspect registrants' establishments. 21 C.F.R. § 1301.31. In the case of applications for exemption from aspects of the regulatory scheme on religious grounds, [the] DEA must also determine pursuant to [RFRA] whether the applicant has established sincerity and the religious nature of the applicant's professed belief system and whether application to the applicant's religious practices of any specific requirement of the CSA's comprehensive regulatory system

would substantially burden the applicant's religious exercise.

*Id.* (footnote omitted). As the DOJ explained, in the case of a petition for a religious exemption, the CSA's registration scheme required that the DEA "also" determine whether the agency's application of the CSA would violate RFRA. *Id.*

The DOJ concluded by stating that if Soul Quest's responses to the DEA's request for additional information were sufficiently complete, the DEA would "promptly initiate a preregistration investigation." *Id.* In turn, a DI would contact Soul Quest to schedule a series of interviews with the church's leadership and individuals with access to or responsibility for the import, storage, safekeeping, and distribution of ayahuasca. "Upon completion of the interviews and onsite inspections," the letter said, the application would be forwarded to the DEA Headquarters for review, and the DEA would decide whether to issue a Certificate of Registration. *Id.* at 4.

After receiving the DOJ's response, Soul Quest provided the agency with the additional requested information. The DEA then conducted its preregistration investigation, including site inspections and interviews with members of the church leadership who oversaw the import, storage, safekeeping, and distribution of ayahuasca.

Once it had completed its investigation, the DEA denied Soul Quest's petition for a religious exemption. The denial precluded Soul Quest from obtaining a Certificate of Registration.[16]

In its final decision denying the exemption, the DEA observed that Soul Quest's leadership had provided inconsistent information about the religious basis for its petition; thus, the agency concluded, Soul Quest's promotion of ayahuasca to the public for self-help and therapeutic reasons was not a sincere exercise of religion under RFRA. It found that even if Soul Quest's leadership established the sincerity of their own individual beliefs, the church could not "establish that the participants in [its] ceremonies [were] using ayahuasca as part of a sincere religious exercise given the ease with which those participants [could] gain access to [ayahuasca] in Soul Quest events, without meaningful commitment to a coherently religious practice." Doc. 59-2 at 5.

The agency proceeded to assume that Soul Quest had made the required showing under RFRA about religious belief and practice and that enforcing the CSA against Soul Quest would impose a substantial burden on religious exercise. It then addressed whether CSA enforcement was the least restrictive means of

_____

[16] It may be that if a petition for a religious exemption is granted, the application for a Certificate of Registration will be relatively perfunctory given that the DEA will have already completed a preregistration investigation. Because Soul Quest never advanced beyond the petition stage, however, the record sheds no light on this question.

furthering compelling governmental interests. According to the DEA, the CSA's prohibitions on Soul Quest's importation of the plants containing DMT, use of those plants to manufacture sacramental tea, and distribution of the tea represented the least restrictive means of furthering two compelling governmental interests: "the need to protect public health and safety from potentially dangerous substances, and the need to prevent diversion of controlled substances into the illicit market." *Id.* at 6.

The DEA explained that because Soul Quest's sources for its ayahuasca were not DEA registrants, the agency could neither determine how much of the controlled substance was being imported nor inspect the substance's chain of custody within the United States to determine whether diversion had occurred. And, in the agency's view, Soul Quest's failure to provide "information evidencing specific plans and a concrete commitment to the legal importation of the plant material constitute[d] a lack of candor which [was] fatal to the Soul Quest petition." *Id.* at 8. The DEA also questioned whether Soul Quest would follow its own safety procedures, noting a pending wrongful death action brought by the estate of a retreat participant against Soul Quest, alleging that after the participant took ayahuasca and kambo (frog secretions) at the retreat, he experienced adverse effects from the substances and became unresponsive. Soul Quest's delay in calling emergency personnel, according to the complaint, contributed to the participant's death. Lastly, the DEA cited Soul Quest's lack of adequate measures to safeguard either the imported plants in its custody or the tea once manufactured.

Based on these findings, the DEA concluded that Soul Quest's religious practices could not be "accommodated in a manner that would allow [the] DEA to preserve its compelling interests in public health and safety and in preventing illegal diversion of ayahuasca." *Id.* at 9. The least restrictive means of protecting these interests, the agency decided, was by "[m]aintaining the CSA's prohibition on the importation, possession, manufacture, and distribution of DMT." *Id.* The letter concluded, "[t]his letter is a final determination under 21 U.S.C. § 877." Doc. 59-2 at 9.

**D.    Procedural History**

After receiving the DEA's final-determination letter, Soul Quest did not immediately seek judicial review from this Court[17] or the United States Court of Appeals for the D.C. Circuit. Instead, it amended its complaint that was pending in the district court. In the amended complaint, Soul Quest challenged the merits of the DEA's final decision in three claims.

First, it alleged that the DEA's final decision violated RFRA because the denial of Soul Quest's petition prohibited the church's "free exercise of religion with ayahuasca," creating "government-imposed coercive pressure on [its members] to change or violate their religious beliefs." Doc. 59 at 32. Soul Quest alleged that its members' religious beliefs were sincere, that the use of ayahuasca was part of their religious practices, and that the DEA's decision

---

[17] It is undisputed that this Court would have been an appropriate circuit court of appeals for Soul Quest, a Florida-based non-profit corporation, to seek judicial review.

burdened their religious exercise without furthering a compelling governmental interest. It also asserted that the CSA's prohibitions on Soul Quest's ability to import, possess, manufacture, or distribute ayahuasca were not the least restrictive means of furthering the DEA's stated interests.

Second, Soul Quest alleged that through the denial, the DEA violated the Administrative Procedure Act ("APA") because the DEA "unlawfully adjudicated [Soul Quest's] religious sincerity in excess of statutory jurisdiction, authority, or limitation." *Id.* at 34.

Third, the church alleged that the DEA violated its right to the free exercise of religion under the First Amendment to the United States Constitution because the DEA's "licensing mechanism," that is, the registration process, was not neutral and generally applicable and required Soul Quest to cease its religious exercise unless and until the DEA "adjudicated the sincerity of [Soul Quest's] religious exercise."[18] *Id.* at 37.

In response, the DEA moved to dismiss Soul Quest's complaint for lack of subject matter jurisdiction and for failure to state a claim. The DEA argued that under 21 U.S.C. § 877 the district court lacked subject matter jurisdiction to hear Soul Quest's claims because the denial of an exemption was a final decision under the CSA, which required Soul Quest to file its action for judicial review in the D.C. Circuit or in this Court. The DEA further argued that

_____

[18] Soul Quest also renewed its request for injunctive relief, which the DEA opposed.

even if the district court had jurisdiction, Soul Quest failed to state a claim for relief under the APA because the DEA had statutory authority to consider Soul Quest's request for a religious exemption to the CSA. And the DEA argued that Soul Quest failed to state a free-exercise claim because the CSA is a neutral and generally applicable law, and Soul Quest's right of free exercise did not relieve it from complying with the law.

The district court dismissed Soul Quest's claims, concluding that because the DEA's decision was, at least in part, made on a non-RFRA and independent basis—Soul Quest's lack of adequate procedures around the importation and use of ayahuasca—§ 877 divested the court of jurisdiction. Section 877 also barred the church's APA and First Amendment free-exercise claims, the court held, because they were inescapably intertwined with the DEA's final decision. Soul Quest timely appealed.[19]

## II.    STANDARD OF REVIEW

We review the dismissal of an action for lack of subject matter jurisdiction *de novo*. *See SEC v. Mut. Benefits Corp.*, 408 F.3d 737, 741 (11th Cir. 2005). On appeal from such a dismissal, we have

---

[19] On the same day that Soul Quest filed its notice of appeal, it filed a separate petition in this Court seeking judicial review of the DEA's final decision pursuant to 21 U.S.C. § 877. The government moved to dismiss the petition, arguing that it was untimely because Soul Quest filed it more than 30 days after the DEA issued its final decision. Soul Quest's petition and the government's motion to dismiss remain pending in a separate case before this Court. We do not decide today whether Soul Quest's petition was timely, nor do we decide the merits of the arguments raised in its petition.

jurisdiction not over the merits, but merely for the purpose of reviewing the district court's determination that it could not entertain the suit. *Green v. Brantley*, 981 F.2d 514, 521 n.2 (11th Cir. 1993).

## III.    DISCUSSION

We must decide whether the district court had subject matter jurisdiction to decide Soul Quest's claims, primarily that the DEA lacked authority to adjudicate Soul Quest's RFRA claim and that the federal courts, under RFRA, have a jurisdictional mandate to adjudicate such claims. Soul Quest's complaint, in effect, asked the district court to review the DEA's decision to deny its petition for a religious exemption. But 21 U.S.C. § 877 says that any final decision made under the CSA's Control and Enforcement subchapter may be reviewed only in specific circuit courts of appeals, meaning that the district courts lack jurisdiction over claims that seek review of such a decision.

We conclude that because the DEA had the authority under the CSA's Control and Enforcement subchapter to grant or deny Certificates of Registration, the denial of Soul Quest's petition—which determined that Soul Quest could not become a DEA registrant—was a final decision made under the subchapter. Accordingly, the CSA's jurisdictional bar in § 877 applied. In making its final decision, the DEA properly considered Soul Quest's rights under RFRA, as mandated by Supreme Court precedent. As we explain below, this consideration did not convert the DEA's decision to one issued exclusively under RFRA and thus outside the scope of § 877.

Soul Quest raised additional challenges, arguing that the DEA's adjudication of its RFRA claim and the process through which it evaluated the claim violated the APA and the Free Exercise Clause of the First Amendment. Because Soul Quest's APA and First Amendment challenges are inescapably intertwined with review of the DEA's final decision, the district court properly dismissed Soul Quest's entire complaint for lack of subject matter jurisdiction.

To explain our conclusion, we first address why the DEA's denial of Soul Quest's petition for a religious exemption was made under the CSA's Control and Enforcement subchapter. Because the DEA's decision was made under the CSA, § 877 vests jurisdiction for the review of Soul Quest's challenge to the exemption's denial solely in the federal courts of appeals, not in the district court. We then explain why Soul Quest's remaining counts are inescapably intertwined with the DEA's final decision such that § 877 applies to bar those claims as well.

## A.    The DEA's Denial of Soul Quest's Petition for a Religious Exemption Was a Decision Made Under the CSA.

At long last we are equipped to answer the question at the heart of this appeal: whether the district court had jurisdiction to review the DEA's decision denying Soul Quest's petition for a religious exemption. The key jurisdictional language appears in 21 U.S.C. § 877. Section 877 provides:

> All final determinations . . . of the Attorney General *under* [the Control and Enforcement] subchapter shall

> be final and conclusive decisions of the matters in-
> volved, except that any person aggrieved by a final de-
> cision . . . may obtain review of the decision in the
> United States Court of Appeals for the District of Co-
> lumbia or for the circuit in which his principal place
> of business is located . . . within thirty days after no-
> tice of the decision.

*Id.* (emphasis added). Section 877 vests jurisdiction for review of final decisions under the CSA solely in the federal courts of appeals.[20] To determine whether this provision applies to the denial of Soul Quest's exemption request, then, we must decide whether the DEA's decision was made "under" the CSA's Control and Enforcement subchapter.

---

[20] The Supreme Court has recognized that "special statutory review scheme[s] . . . may preclude district courts from exercising jurisdiction over challenges to federal agency action." *Axon Enter., Inc. v. Fed. Trade Comm'n,* 143 S. Ct. 890, 900 (2023). Although district courts typically hear such challenges by way of 28 U.S.C. § 1331, Congress may substitute that district court authority with an alternative scheme of review. *Axon,* 143 S. Ct. at 900. Congress may do so "explicitly, providing in so many words that district court jurisdiction will yield." *Id.* Or Congress may do so "implicitly, by specifying a different method to resolve claims about agency action." *Id.* With 21 U.S.C. § 877, Congress implicitly substituted the typical district court authority with review in a court of appeals following the agency's own review process. "The agency effectively fills in for the district court, with the court of appeals providing judicial review." *Axon,* 143 S. Ct. at 900. Thus, § 877's requirement that judicial review of the DEA's final decisions must be had in an appropriate court of appeals is indeed jurisdictional.

This is simply a question of statutory interpretation. We need only look to this Court's lodestar of statutory interpretation: if the language at issue has a plain and unambiguous meaning, that meaning controls, and the inquiry ends. *United States v. Silva*, 443 F.3d 795, 797–98 (11th Cir. 2006). There is nothing ambiguous about the term "under." To confirm our understanding, we turn to common dictionary definitions of the term. *Koch Foods, Inc. v. Sec'y, U.S. Dep't of Lab.*, 712 F.3d 476, 480 (11th Cir. 2013) ("Courts often look to the dictionary definitions of terms [in a statute] to determine their common usage."). In this context the term under means "[i]n accordance with" or "according to." *See Under, Oxford English Dictionary* (online ed.), https://www.oed.com/search/dictionary/?scope=Entries&q=under [https://perma.cc/8N4P-MZAR]; *see also Under, Cambridge Dictionary* (online ed.), https://dictionary.cambridge.org/us/dictionary/english/under [https://perma.cc/GQ5E-QKRM] ("according to"); *Under, Webster's Seventh New Collegiate Dictionary* 966 (1971) ("subject to the authority, guidance, or instruction of"). All we have left to do is decide whether the DEA's denial of Soul Quest's petition for a religious exemption was indeed a decision made *in accordance with* or *according to* the CSA's Control and Enforcement subchapter.

To recap, the CSA provides, as relevant here, a process for obtaining permission to handle controlled substances without violating the CSA. An individual or entity must apply for registration. If the registration application is approved, the applicant will be issued a Certificate of Registration and may handle a controlled substance to the extent authorized by the certificate. The statute

contemplates that registrants will handle substances for medical, scientific, or industrial uses. *See* 21 U.S.C. § 823(a). Those seeking to handle controlled substances as part of religious practices may seek registration via a petition for religious exemption.

In its petition, Soul Quest sought a religious exemption "to the provisions of the [CSA], 21 U.S.C. §§ 801, *et seq.*, specifically as it pertain[ed] to the ritual use by Soul Quest of ayahuasca for its sacramental activities." Doc. 59-10 at 2. The petition Soul Quest filed was a prerequisite to obtaining a Certificate of Registration. The petition was part one of a two-step process, successful completion of which would have allowed Soul Quest to handle DMT. We focus on registration here because, although the CSA and its attendant regulations permit waiver of CSA provisions including registration as a potential alternative route to lawful use of controlled substances; *see* 21 U.S.C. § 822(d), 21 C.F.R. § 1307.03; Soul Quest did not seek a waiver of any provision. Therefore, Soul Quest's only avenue for lawfully handling ayahuasca was registration via the petition for a religious exemption.

The record supports our understanding of the role played by Soul Quest's petition for a religious exemption. The DEA classified Soul Quest as an applicant for registration, deeming its "petition for exemption . . . to be commensurate with an application for registration." Doc. 45-2 at 2. The agency said that "the group would need to be registered as an Importer and Manufacturer" to handle ayahuasca. *Id.*

The DEA's conclusion was consistent with its RFRA Guide-lines, which specified that only a Certificate of Registration would leave Soul Quest free to handle ayahuasca without the threat of CSA enforcement. And, in this way, the guidelines were consistent with the way the CSA has been applied in practice: the only religious organizations legally permitted to handle ayahuasca have been registered under the CSA.

The DEA's communications with Soul Quest bolster our understanding that the church was seeking DEA registration for a religious use of DMT. The DOJ (on behalf of the DEA) conveyed to Soul Quest's attorney that the church would need to apply for a Certificate of Registration to use ayahuasca, even if its RFRA petition was successful. Additional communications repeatedly referred to Soul Quest as a hopeful registrant. In its undated letter responding to Soul Quest's petition, the DEA advised that all individuals and entities who handled controlled substances "must be registered by [the] DEA" and further advised of the responsibilities of "registrants." Doc. 59-3 at 2. In the letter, the DEA sought to explore an accommodation of Soul Quest's use of ayahuasca by bringing its "practices within the comprehensive regulatory scheme established by the [CSA]." *Id*. Registering Soul Quest's handling of ayahuasca would allow the DEA to regulate Soul Quest's importation, manufacture, and distribution of the controlled substance while allowing Soul Quest to avoid enforcement of the CSA against it.

Because Soul Quest was seeking CSA registration, its petition for a religious exemption was a stage in the registration process. The CSA itself contemplated registration for nonreligious uses of controlled substances. The petition process provided a route to registration for religious uses, in compliance with RFRA.

The DEA's decision denying Soul Quest's use of ayahuasca thus conducted the analysis required by RFRA and considered factors that, under the CSA, are relevant to all applications for registration. Namely, the DEA discussed whether Soul Quest's handling of DMT was "consistent with the public health and safety" and whether Soul Quest maintained "effective controls against diversion." 21 U.S.C. § 823(a)(1), (6). The fact that the DEA used the language of the CSA's registration provisions is further evidence that the agency's evaluation of Soul Quest's petition for a religious exemption was part and parcel of the CSA's registration scheme.[21]

---

[21] Our dissenting colleague argues, to the contrary, that this discussion is evidence of a decision under RFRA rather than the CSA because these factors were part of the DEA's assessment of its "compelling interest." But the considerations overlap: the factors the DEA is required to consider in granting registration also comprise the DEA's compelling interests.

This distinction is ultimately beside the point, however. As we explain below, even though the DEA's final decision "applied" or was made "under" or "pursuant to" RFRA, it was also made under the CSA as part of the agency's process for allowing the handling of controlled substances free from CSA enforcement. The DEA's consideration of Soul Quest's RFRA rights did not remove the agency's final decision from the CSA's registration scheme.

So, the DEA's decision denying Soul Quest's petition for a religious exemption was a denial at the first step of the two-step process for obtaining permission to handle DMT—a decision well within the DEA's authority. By denying Soul Quest's petition for a religious exemption to the CSA, the DEA precluded Soul Quest from applying for registration. The DEA's determination was therefore a final decision made *under* the Control and Enforcement subchapter of the CSA. Because § 877 required Soul Quest to obtain judicial review of that decision in this Court (or the D.C. Circuit), the district court lacked subject matter jurisdiction to review the merits of Soul Quest's challenge to the denial.

Soul Quest and the dissenting opinion advance somewhat different arguments against the district court's conclusion, and ours in turn, that the district court lacked jurisdiction to hear Soul Quest's RFRA challenge. They both argue that the DEA's decision denying Soul Quest's religious exemption petition was not made under the CSA. But they part ways in explaining why. Soul Quest reasons that the DEA's decision could not have been made under the CSA because the CSA does not grant the DEA authority to adjudicate rights under RFRA. Instead, Soul Quest argues, RFRA's language shows that Congress provided for exclusive judicial relief for alleged RFRA violations in the courts rather than federal agencies. The dissent does not contest the DEA's authority; rather, it contends that because the agency's final decision analyzed RFRA, it was made under RFRA alone. This rationale assumes that a decision under one statute necessarily excludes the other. We find unpersuasive both Soul Quest's and the dissent's rationales.

We review Soul Quest's arguments first. Then we respond to the dissent's position.

We agree with Soul Quest that, in denying Soul Quest's petition, the DEA conducted an analysis under RFRA that is not specifically addressed in the CSA itself. We disagree with Soul Quest, however, that the lack of any mention of RFRA in the CSA means that the DEA's denial could not have been a final decision *under* the CSA because the DEA had no authority to adjudicate Soul Quest's rights under RFRA.

To review, RFRA mandates that the government may "not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," except when the government can demonstrate that "application of the burden to the person . . . is in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1. When the Supreme Court considered the relationship between RFRA and the CSA in *O Centro*, the government argued that the CSA was not amenable to "individualized exceptions." *Id.* at 430. The Court disagreed and warned the government that under RFRA there would be circumstances when an exception to the CSA would be necessary. *Id.* at 434.

The DEA's consideration of Soul Quest's rights under RFRA did not exceed the agency's authority. As the Supreme Court explained in *O Centro*, conflict between the CSA and RFRA is expected. *See id.* at 432. The DEA's religious exemption process and

the accompanying RFRA Guidelines were a direct response to the Supreme Court's warning in *O Centro* that RFRA may warrant accommodations to the CSA. *See id*. at 434. Therefore, it was entirely appropriate that the DEA seek to reconcile the two statutes and that the agency consider Soul Quest's rights under RFRA when implementing the CSA. *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2383 (2020) (explaining that given RFRA's broad protection for religious liberty, it is "appropriate for [government agencies] to consider RFRA" when implementing federal law); *see also Christians v. Crystal Evangelical Free Church (In re Young)*, 141 F.3d 854, 861 (8th Cir. 1998) (concluding that Congress, by passing RFRA, had "effectively amended" the Bankruptcy Code by "engraft[ing]" RFRA's strictures to its provisions).

To be sure, a federal agency might make an incorrect determination under RFRA. A person who believes that the agency's determination is flawed is most certainly entitled to further review in the federal courts. But, here, Congress has vested judicial review of agency determinations in the federal courts of appeals, and so judicial review must be sought in the appropriate court of appeals. In this action, however, Soul Quest sought judicial review of the DEA's decision in the district court. We reject Soul Quest's argument that the DEA's decision was not made under the CSA because the decision adjudicated Soul Quest's rights under RFRA. Instead, we conclude that although the DEA considered Soul Quest's rights under RFRA in implementing the CSA, as *O Centro* requires, its decision was still made in accordance with and under the CSA.

Soul Quest counters that RFRA's language defeats the DEA's authority to evaluate RFRA rights; instead, it argues, RFRA mandates that only courts can undertake such consideration. Soul Quest points to RFRA's language that an aggrieved party has "the right to seek judicial relief" for any alleged violation of RFRA. Appellant's Br. 23 (emphasis omitted). RFRA provides that "[a] person whose religious exercise has been burdened in violation of [RFRA] may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." 42 U.S.C. § 2000bb-1(c). Soul Quest argues that the language "in a judicial proceeding" indicates that courts, not the DEA, are required to conduct the RFRA analysis.

We reject Soul Quest's argument. It is true that RFRA establishes a private right of action, but "[t]he mere existence of a private right of action under a federal statute does not eliminate jurisdictional obstacles." *Odei v. U.S. Dep't of Homeland Sec.*, 937 F.3d 1092, 1095 (7th Cir. 2019); *see also Adorers of the Blood of Christ v. FERC*, 897 F.3d 187, 193–95 (3d Cir. 2018); *La Voz Radio de la Comunidad v. FCC*, 223 F.3d 313, 319 (6th Cir. 2000). To raise a claim in federal court, a plaintiff must demonstrate not only that she has a right of action to initiate a claim, but also that a federal court will have jurisdiction over the claim. *Harris Cnty. v. MERSCORP Inc.*, 791 F.3d 545, 552 (5th Cir. 2015). Put differently, "establishing the court's jurisdiction and the litigants' right of action are two requirements that must be satisfied independently." *Id.* (citing *Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers*, 414 U.S. 453, 455–56 (1974)). Although Soul Quest may have a right of action under

RFRA, it still must establish that the district court has jurisdiction over its claim. The language Soul Quest points to in RFRA does not clear that jurisdictional hurdle.

We now turn to our dissenting colleague's argument. Unlike Soul Quest, the dissenting opinion does not dispute that the DEA had the authority (and indeed, the duty) to consider Soul Quest's RFRA rights in deciding whether to allow the church to handle ayahuasca free from DEA enforcement. But the dissent says that the DEA's analysis of RFRA precludes its final decision from falling under the CSA. Implicit in the dissent's argument—but never definitively declared—is the assumption that a decision cannot be issued under both the CSA and RFRA. We can find nothing in our precedent—or any other authority, for that matter—to support this proposition.

Soul Quest challenged the DEA's denial of its religious exemption to the CSA—a claim that necessitated resolving the embedded issue of its rights under RFRA. As we explained above, per *O Centro*, the DEA was required to consider RFRA when evaluating Soul Quest's petition for a religious exemption from CSA enforcement. But the agency's consideration of RFRA does not convert its final decision to one made outside the CSA.

The DEA's final decision adjudicated both Soul Quest's RFRA rights and its ultimate right to a Certificate of Registration under the CSA. Our colleague in dissent accuses us of trying to shoehorn registration into the exemption inquiry, which, he contends, is entirely separate. But we focus on registration because that

is what Soul Quest sought, and what the DEA understood it to be seeking, as a means of avoiding CSA enforcement. Although our dissenter is correct that we can conceive of the DEA's final decision as having been made under RFRA in the sense that the DEA had to consider and apply RFRA's requirements, the ultimate question was whether Soul Quest would be permitted to handle ayahuasca legally. This question can be answered solely through application of the CSA.

No matter that the final decision can be said to have been made under *both* RFRA and the CSA. This conception squares with our definition of the term "under": it is no stretch of the English language to say that the DEA's decision was made in accordance with, or according to, both statutes. In this case, our conclusion that the decision was in accordance with the CSA is determinative of the dispositive question, as it triggers the jurisdictional provision of 21 U.S.C. § 877. But this does not mean that the decision was not also made "under" RFRA when we apply the plain meaning of the term.[22]

---

[22] The dissent accuses us of ignoring the DEA's final decision which—unsurprisingly—conducts a RFRA analysis with no explicit reference to denying registration. No one disputes, though, that RFRA affords certain rights to religious petitioners and establishes an inquiry that the DEA must conduct when confronted with a religious exemption request. In that sense, the inquiry is conducted "under RFRA." But the dissent fails to bridge the logical gap between these facts that no one contests and its conclusion that the DEA's decision was *not* made under the CSA.

Even though the DEA's decision applied both the CSA and RFRA, we conclude that the DEA's authority to decide Soul Quest's petition for a religious exemption came from the CSA because the CSA is the source of the DEA's authority both to prohibit Soul Quest from handling ayahuasca and to allow it to do so under the CSA's registration provisions.[23] RFRA requires that the DEA consider religious rights in the implementation of the CSA, but it is not an independent source of the DEA's authority.

_____

Setting that key failure aside, the dissent never grapples with the DEA's repeated references to CSA registration in the final decision and its other communications with Soul Quest. For example, in its final decision, the DEA noted that it "places great weight on a *registrant's* candor" and that such candor was essential to the functioning of the CSA's "closed regulatory scheme." Doc. 59-2 at 7 (emphasis added) (internal quotation marks omitted). The DEA explained that this scheme relies on the cooperation of registrants, both during investigations, and in following regulations such as "controlled substances that are imported into the United States must be directly shipped to [a] DEA registrant to keep the controlled substances within the closed system." *Id.* Soul Quest's lack of cooperation in the preregistration investigation was, in the DEA's view, fatal to Soul Quest's petition, in part, because the lack of cooperation indicated to the DEA that the church's use of DMT would not comply with the CSA's registration provisions.

[23] The dissent argues that the DEA's registration authority does not extend to religious uses. This is incorrect. The DEA has granted registrations allowing two churches to handle DMT legally.

As we noted above, the agency also administers regulations under the registration waiver provision, 21 U.S.C. § 822(d). Under this provision, a regulation allows the Native American Church to handle peyote legally. 21 C.F.R. § 1307.31. Section 822(d) and its accompanying regulations are part of the CSA's registration scheme as well, and a decision to grant an exemption from registration is also a decision "under" the CSA.

In sum, pursuant to its authority under the CSA, the DEA made a final decision on Soul Quest's petition for religious exemption under both the CSA and RFRA, triggering § 877's jurisdictional bar. RFRA does not defeat that bar and bestow federal court jurisdiction over Soul Quest's claim. The DEA has the authority to determine whether to grant a Certificate of Registration. The DEA's consideration of a petitioner's rights under RFRA does not deprive it of that authority, nor does it preclude a decision from being rendered "under" the CSA.

We emphasize that the exemption petition process for conducting the required RFRA analysis under the CSA does not diminish RFRA's protections. Rather, it provides an orderly path for applying those protections consistent with *O Centro*'s directive. And any failures in the agency's RFRA analysis may be litigated, so long as the challenges are made in the appropriate forum.

## B.    Soul Quest's APA and First Amendment Claims Were Also Subject to § 877.

Last, we examine whether the district court had jurisdiction to review Soul Quest's additional claims, in which it alleged that the DEA violated the APA and the Free Exercise Clause of the First Amendment.

When Congress has provided in the federal courts of appeals an exclusive forum for the correction of procedural and substantive administrative errors, a plaintiff cannot bypass that forum by seeking relief in district court. *See Green*, 981 F.2d at 521. Accordingly, this Court has held that a district court lacks subject matter

jurisdiction to hear "an impermissible collateral challenge to [an] agency order." *Id.* An impermissible collateral challenge is a claim for relief that is "inescapably intertwined with a review of the procedures and merits surrounding [an agency's] order." *Id.* When a statute vests exclusive jurisdiction in the circuit courts of appeals, those courts have exclusive jurisdiction to "affirm, modify, or set aside" any part of a determination. *Id.*

In its operative complaint, Soul Quest challenged the DEA's final decision as a violation of the APA and the Free Exercise Clause of the First Amendment. In its APA count, Soul Quest alleged that the DEA's adjudication of the church's religious sincerity was done without statutory authority or jurisdiction. In its First Amendment count, Soul Quest alleged that its religious beliefs were sincere, its use of ayahuasca was part of its religious exercise, and the DEA's adjudication of these two prongs of the RFRA analysis was improper. These claims amount to an impermissible collateral challenge because they are "inescapably intertwined with a review of the procedures and merits surrounding the [DEA's] order."[24] *Id.*

_____

[24] To the extent that Soul Quest challenges only the DEA's RFRA analysis and conclusions, that is, that Soul Quest's religious beliefs were not sincerely held and that its use of ayahuasca was not pursuant to a religious exercise, we conclude that the analysis and conclusions are also inescapably intertwined with a review of the merits of the agency order. To review the DEA's RFRA analysis would require a district court to review the DEA's non-RFRA findings, such as whether Soul Quest maintained effective controls against diversion of the controlled substance.

That is, to determine whether the DEA's actions violated the APA or the First Amendment, a court must necessarily review "the procedures and merits surrounding the [agency's] order." *Id.* To accept Soul Quest's arguments, the district court would have to consider whether to affirm, modify, or set aside the DEA's decision. The authority to take these actions is exclusively vested in this Court (or the D.C. Circuit). *See* 21 U.S.C. § 877. So the district court also lacked subject matter jurisdiction to hear Soul Quest's APA and First Amendment claims, and it properly dismissed them.[25]

---

Soul Quest also raises two additional arguments for the first time on appeal. First, it argues that the DEA's process for requesting a religious exemption violates the "Major Rules Doctrine." Appellant's Br. 12. Second, it argues that the RFRA Guidelines violate the APA because the guidelines were issued without a "general notice of proposed rulemaking" and an opportunity for interested persons to "participate in the rule[making]" (otherwise known as the APA's notice-and-comment requirement). *Id.* at 20 (internal quotation marks omitted). Because we generally do not consider arguments raised for the first time on appeal, and we see no exceptional circumstances to warrant disregarding this rule, we consider Soul Quest's arguments abandoned. *See United States v. Campbell*, 26 F.4th 860, 874–75 (11th Cir. 2022) (en banc); *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1332 (11th Cir. 2004).

[25] We note that the Supreme Court has held that a district court *does* have subject matter jurisdiction, however, to hear a case where the plaintiff challenges an agency's practices and procedures as unconstitutional. *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 491–94 (1991). But we agree with the district court that Soul Quest's claims articulated in its operative complaint do not "amount to general collateral challenges to unconstitutional practices and policies" used by the DEA in processing registration applications. Doc. 74 at 6 (internal quotation marks omitted).

## IV.     CONCLUSION

We conclude that the DEA's denial of Soul Quest's petition for a religious exemption was a final decision under the Control and Enforcement subchapter of the CSA. Therefore, Soul Quest was required to obtain judicial review of the DEA's denial, as well as its related constitutional, statutory, and procedural challenges, in this Court (or the D.C. Circuit), pursuant to 21 U.S.C. § 877. Because § 877 applies, the district court properly dismissed Soul Quest's complaint for lack of subject matter jurisdiction.

**AFFIRMED.**

---

In a supplemental letter, Soul Quest argues that the Supreme Court's recent decision in *Axon Enterprise, Inc. v. Federal Trade Commission* allows it to proceed directly to district court because its claims are "'outside of the [DEA's] expertise'" and would "'foreclose meaningful judicial review.'" Appellants' Apr. 18, 2023 Citation of Supp. Authority 1–2 (alteration adopted) (quoting *Axon*, 143 S. Ct. at 900). We find *Axon* inapposite, however. The parties in *Axon* did not take issue with the merits of an agency order; instead, they argued that "the agencies [at issue], as currently structured, [were] unconstitutional in much of their work." *Axon*, 143 S. Ct. at 897. In other words, the parties argued that "an agency [was] wielding authority unconstitutionally in all or a broad swath of its work." *Id.* at 902. Here again, Soul Quest has not challenged the constitutionality of the DEA's structure or alleged that it is acting unconstitutionally in much of its work. Because Soul Quest's claims are readily distinguishable from the claims at issue in *Axon* and, in any event, are intertwined with a decision made within the DEA's clear authority, we reject this argument.

NEWSOM, Circuit Judge, dissenting:

Candidly, the dispositive question here is pretty boring: Did the district court have jurisdiction to consider a church's challenge to the Drug Enforcement Administration's decision denying its request to use a controlled substance in its services, or should the church instead have sought review directly in the court of appeals? The answer to that question, though, turns on an interesting question of statutory interpretation: Was the DEA's refusal of the church's petition made "under" the Controlled Substances Act? The majority says it was. I disagree. The evidence that the DEA rendered its decision "under" the Religious Freedom Restoration Act, rather than the CSA, is overwhelming—it leaps off the pages of the DEA's written determination, and it follows straightaway from the statutory and regulatory regime that the DEA is charged with enforcing. Because I don't think the majority's contrary conclusion withstands scrutiny, I respectfully dissent.

## I

The Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.* (1993), is a potent statute. It is, to use the Supreme Court's term, a "super statute" that suspends "the normal operation of other federal laws." *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1754 (2020). In effect, RFRA forestalls the operation of any federal law, regulation, or policy that would "substantially burden[] a person's exercise of religion" unless the government can prove that enforcement survives strict scrutiny in that it "both furthers a compelling

governmental interest and represents the least restrictive means of furthering that interest." *Id*. (citing § 2000bb–1).

That test, all seem to agree, controls what's going on here. Soul Quest Church of Mother Earth wants to make sacramental use of a controlled-substance-containing brew called ayahuasca. Ordinarily, of course, the Controlled Substances Act, 21 U.S.C. § 800 *et seq*. (1971), would prohibit the church and its members from doing so. But RFRA permits what the CSA would otherwise forbid. *See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 436–37 (2006). RFRA thus disrupts the DEA's normal-course enforcement of the CSA; the agency must restrain itself when religious exercise is at stake.

For decades, the DEA refused to establish a process for evaluating requests for exemptions "for religious purposes." Br. of DEA at 4. While it had always honored the CSA's express statutory carveout for "legitimate medical, scientific, research, and industrial" uses of otherwise-illegal drugs, 21 U.S.C. § 823(a)—pursuant to which an applicant can obtain a "Certificate of Registration" under § 822—the DEA long held that a religious-exemption protocol would be "categorically barred by the CSA and inappropriate." Br. of DEA at 4. It wasn't until 2006, when the Supreme Court held in *Gonzalez* "that [RFRA] requires [the] DEA to provide individualized consideration to requests for religious exemptions to the CSA," that the agency unveiled a new, separate "petition process for seeking RFRA exemptions." *Id*.; *see Guidance Regarding Petitions for Religious Exemption from the Controlled Substances Act Pursuant to the*

22-11072        Newsom, J., Dissenting        3

*Religious Freedom Restoration Act*, Doc. 59-11 at 2 (hereinafter, as in the majority opinion, "RFRA Guidelines").[1]

The process for obtaining a religious exemption from the CSA is straightforward, and it proceeds in two distinct steps. First, the exemption-seeker files what the DEA calls a "RFRA petition," which provides the agency the information it needs to apply RFRA's strict-scrutiny test. *See* RFRA Guidelines at 2–3. If the DEA grants the petition, it awards the applicant a "RFRA exemption[]." Br. of DEA at 4. The exemption-seeker must then complete a second step: "appl[ying] for and receiv[ing] a DEA Certificate of Registration." RFRA Guidelines at 3; *see also* Br. of DEA at 4. Although it's not entirely clear, that's presumably the same certificate given to those who can demonstrate "legitimate medical, scientific, research, and industrial" uses under § 823(a). In any event, only when both conditions are satisfied—when "the [RFRA] petition has been granted" *and* the Certificate of Registration is in hand—is the applicant deemed to be exempt from the CSA. RFRA Guidelines at 3. Here, the agency denied Soul Quest's RFRA petition, thereby dashing its hopes of obtaining an exemption. To be clear, though, even if its petition had been granted, Soul Quest would have had to continue complying with the CSA—so say the DEA's RFRA Guidelines, anyway—until it completed the second step.

---

[1] NB the document's title: *Guidance Regarding Petitions for Religious Exemption from the Controlled Substances Act Pursuant to the Religious Freedom Restoration Act.* The "[p]ursuant to" (which is to say, *under*) language indicates, and fills in, the religion-sized gap in the CSA.

As I hope to show, the majority's key error is that it effectively merges these two steps into one. The majority acknowledges that obtaining a religious exemption to the CSA's prohibitions entails a "two-step process." *E.g.*, Maj. Op. at 11, 27, 30. The majority further acknowledges that "Soul Quest never advanced beyond the petition stage" and thus never even got around to "appl[ying] for a Certificate of Registration." *Id.* at 18, n. 16. And yet the majority concludes that the DEA's petition-stage decision "adjudicated *both* Soul Quest's RFRA rights and its ultimate right to a Certificate of Registration under the CSA"—and accordingly, the majority says, "we can conceive" of the DEA's decision "to have been made under *both* RFRA and the CSA." *Id.* at 34–35 (first emphasis added). Respectfully, and for reasons I'll try to explain, I just don't think that's right.

## II

The majority and I agree on plenty. First, we agree on the governing statute: Under 21 U.S.C. § 877, federal courts of appeals, rather than federal district courts, have original jurisdiction over challenges to DEA determinations made "under" the CSA's Control and Enforcement Subchapter. Here's the relevant language:

> All final determinations, findings, and conclusions of the Attorney General[2] under this subchapter shall be

---

[2] The DEA stands in for the Attorney General here. The CSA allows the Attorney General to "delegate any of his functions under this subchapter to any officer or employee of the Department of Justice." 21 U.S.C. § 871(a). And

> final and conclusive decisions of the matters involved,
> except that any person aggrieved by a final decision
> of the Attorney General may obtain review of the de-
> cision in the United States Court of Appeals for the
> District of Columbia or for the circuit in which his
> principal place of business is located . . . .

21 U.S.C. § 877.

Second, we agree that the jurisdiction that § 877 vests in the courts of appeals is exclusive; a district court may *not* "review" "fi-nal decision[s]" made "under" the pertinent subchapter. *Id.* That's because when Congress "specifically designates a forum for judicial review of administrative action, that forum is exclusive." *Drum-mond Coal Co. v. Watt*, 735 F.2d 469, 475 (11th Cir. 1984). Accord-ingly, "claims falling within the ambit of section 877—those chal-lenging a final decision of the DEA under the CSA—are considered by the courts of appeals, not the district courts." *Hemp Indus. Ass'n v. Drug Enf't Admin.*, 36 F.4th 278, 286 (D.C. Cir. 2022).

Third, we agree on the dispositive interpretive question. As the majority correctly frames it, we must "decide whether the [DEA's] denial of [Soul Quest's] petition for a religious exemption to the Controlled Substances Act . . . was a decision made *under* the CSA's Control and Enforcement subchapter." Maj. Op. at 2–3

---

the Attorney General hasn't been shy about doing so: He delegated all his CSA powers to the DEA. 28 C.F.R. § 0.100(b) (assigning to the DEA the "func-tions vested in the Attorney General by the Comprehensive Drug Abuse Pre-vention and Control Act of 1970, as amended").

(emphasis added). If the DEA made its determination "under" the CSA, Soul Quest was wrong to bring its challenge in district court. If, instead, the DEA acted "under" RFRA, Soul Quest went to the right place.

Fourth, we agree on the meaning of the key term "under." That word means, roughly, "in accordance with" or "according to." *Id.* at 26; *accord, e.g.*, *Webster's Third New International Dictionary* 2487 (2002) ("required by: in accordance with," as in "rights under the law"); *Oxford Dictionary of English* 1933 (3d ed. 2010) ("as provided by the rules of; in accordance with," or "controlled, managed or governed by").

Finally, we agree on the object of our inquiry: Soul Quest, as the majority correctly explains, has challenged "the DEA's decision to deny its petition for a religious exemption," Maj. Op. at 23—a decision that the agency memorialized in a detailed eight-page letter dated April 16, 2021. *See* Doc. 59-2.

All that remains, then, is to decide whether the DEA rendered its April 2021 decision in accordance with—and thus "under"—the CSA. I think that the evidence overwhelmingly shows that it acted in accordance with—"under"—RFRA, *not* the CSA. As I hope to show, the DEA repeatedly said that's what it was doing, and the regulatory regime supports the DEA's say-so.

## A

The most obvious place to start in determining whether the DEA rendered its "final decision" on Soul Quest's petition "under" the CSA is, it seems to me, the face of the DEA's April 2021 decision

letter itself.  So let's take a close look.  TL;DR:  From stem to stern, the DEA's letter is about RFRA; the CSA has essentially nothing to do with it.  Here's how the majority (accurately) recaps the DEA's decision:

> The agency concluded that the church had not met its burden *under RFRA* to show that its members' beliefs were sincerely held and that its use of ayahuasca was part of a religious exercise.  In addition, the DEA found compelling governmental interests in maintaining public safety and preventing diversion of the tea into improper channels.  And it found that the CSA's prohibitions furthered those compelling interests with the least restrictive means.

Maj. Op. at 4 (emphasis added).

A close inspection reveals just how accurate the majority's summary is.  Here are the details.  For starters, Soul Quest filed what the DEA called a "RFRA petition."  Doc. 59-2 at 4 n.4.  And the agency didn't just *call* Soul Quest's request a RFRA petition, it evaluated it as such—so much so, in fact, that the agency structured its analysis by using RFRA catchphrases as its subject headings.  *See, e.g.*, *id.* at 2 ("Sincere Religious Belief and Exercise"); *id.* at 5 ("Least Restrictive Means of Furthering Compelling Governmental Interests").

The DEA began by explaining that it had "evaluated" Soul Quest's petition "in accordance with"—those are DEA's words, as if taken right out of the majority's own dictionary definition of "under"—"the framework set forth in [RFRA]."  *Id.* at 1.  As

background, the agency cited, among other things, the Supreme Court's decision in *Gonzalez*, a memo from then-Attorney General Sessions regarding religious liberty, and the DEA's RFRA Guidelines. The decision then quoted RFRA's two-part statutory test: "According to RFRA"—which again, per the agreed definition, simply means "under" RFRA—"the 'Government shall not substantially burden a person's exercise of religion' unless the Government can demonstrate 'that application of the burden to the person (1) is in furtherance of a compelling governmental interest and (2) is the least restrictive means of furthering that compelling governmental interest.'" *Id.* As an initial matter, the DEA explained—again citing *Gonzalez*—Soul Quest had to show that application of the CSA would "(1) substantially burden" a "(2) religious exercise" that is (3) based on a "sincerely held" belief. *Id.* (citing *Gonzalez*, 546 U.S. at 428). If Soul Quest could make that showing, the decision continued, the burden would shift to the agency to prove that enforcement of the CSA would advance "a compelling governmental interest by the least restrictive means." *Id.* Needless to say, all of that is straight out of RFRA. *See* 42 U.S.C. § 2000bb-1. Not only is it not "in accordance with" the CSA, but the CSA has nothing to do with it—any of it.

Having articulated the governing standard—RFRA's standard, that is—the DEA proceeded to apply it. It turned first to the question whether Soul Quest's professed beliefs were sincere. That's a RFRA question, of course, not a CSA question. *See Gonzalez*, 546 U.S. at 430–31 (observing that RFRA protects individuals "whose *sincere* exercise of religion is being substantially burdened"

(emphasis added)).  On the merits, the DEA found Soul Quest's be-liefs to be insincere.  In particular, the DEA faulted church leaders for failing sufficiently to emphasize the church's foundational text during interviews, for opening ayahuasca retreats to "any individ-ual who is willing to sign various forms and pay a fee," for neither "requir[ing] [n]or expect[ing] individuals" who have attended re-treats "to have any continuing involvement," for running a well-ness center that offers "an extensive menu of services ranging from yoga and acupuncture to marital counseling," and for advertising ayahuasca "primarily" as "a medicine" to treat "depression, anxi-ety, [PTSD]," and "drug addiction."  Doc. 59-2 at 2–4.  On those bases, the DEA concluded—twice, for good measure—that Soul Quest hadn't satisfied its burden "under RFRA" of demonstrating the existence of a sincere religious belief.  *Id.* at 4 ("DEA therefore concludes that Soul Quest's promotion of ayahuasca to the public in this manner does not constitute a sincere exercise of religion *un-der RFRA.*" (emphasis added)); *id.* ("In sum, Soul Quest has not sat-isfied its burden *under RFRA* of demonstrating that its use of aya-huasca is pursuant to a religious exercise and based on a sincerely held religious belief." (emphasis added)).

   The DEA could have stopped there, having concluded that Soul Quest lacked a sincere religious belief in the therapeutic uses of ayahuasca.  As the agency explained, "under RFRA"—that phrase again—it didn't need to conduct a strict-scrutiny analysis be-cause Soul Quest's RFRA-exemption petition failed at the gate.  *Id.* at 5; *see also, e.g.*, *United States v. Grady*, 18 F.4th 1275, 1285 (11th Cir. 2021) (recognizing that a "RFRA claim" fails if the applicant's

religious belief isn't "sincerely held").  But the DEA went on to say that even if Soul Quest had managed to establish its prima facie case "under RFRA"—again—its exemption request would fail because enforcement constituted "the least restrictive means of furthering two compelling governmental interests: the need to protect public health and safety from potentially dangerous substances, and the need to prevent diversion of controlled substances into the illicit market."  Doc. 59-2 at 5.

The upshot of the DEA's own written decision is unmistakable.  From beginning to end, the agency said in so many words that it was proceeding "in accordance with" and "according to"—and, indeed, "under"—RFRA, not the CSA.  The CSA doesn't require the DEA to grant religious exemptions of the sort that Soul Quest sought; RFRA does.  The CSA doesn't task the DEA with analyzing religious sincerity; RFRA does.  The CSA doesn't concern itself with compelling governmental interests and least restrictive means; RFRA does.  I would take the DEA at its (repeated) word:  In acting on Soul Quest's petition, it was acting "under" RFRA, *not* the CSA.[3]

## B

Against all this, the majority insists that in its April 2021 letter the DEA—seemingly unbeknownst even to the agency itself—

---

[3] I acknowledge, of course, that the final sentence of the DEA's decision recites that "[t]his letter is a final determination under 21 U.S.C. § 877."  Doc. 59-2 at 8.  But that throw-away line cannot, I submit, whitewash everything else that the DEA's letter says and does.

"adjudicated *both* Soul Quest's RFRA rights and its ultimate right to a Certificate of Registration" under 21 U.S.C. § 822 and, therefore, that "we can conceive" of the DEA's written decision "as having been made under *both* the CSA and RFRA." Maj. Op. at 34–35 (first emphasis added). I'll confess that the Certificate-of-Registration angle came as something of a surprise. So far as I'm aware, the government has never even *argued* that the DEA decided Soul Quest's petition—either formally or otherwise—under § 822's Certificate-of-Registration regime. *See* Br. of DEA *passim*. And with good reason: The Certificate-of-Registration process has essentially nothing to do with the RFRA-petition process.

As the majority itself explains, the Certificate-of-Registration program was born out of Congress's recognition that many controlled substances have "useful and legitimate medical purpose[s] and are necessary to maintain the health and general welfare of the American people." 21 U.S.C. § 801(1). It was, as the majority explains, "[t]o that end"—*i.e.*, preserving beneficial "medical"- and "health"-related uses—that Congress created the Certificate-of-Registration regime. Maj. Op. at 8. Indeed, the CSA provision that establishes the standards for obtaining a Certificate of Registration specifically warns against the diversion of controlled substances into any "other than legitimate medical, scientific, and industrial channels." 21 U.S.C. § 823(b)(1). Needless to say, churches exist to further religious objectives, not "medical, scientific, [or] industrial" ones. So not only is the Certificate-of-Registration program not affirmatively geared toward religious uses of the sort at issue here, it would also seem to be affirmatively geared *against* them.

All that aside, I don't think the majority's reframing of the DEA's decision holds water even on its own terms. I say so for several reasons. First, as the majority acknowledges, the DEA's determinations about (1) whether to grant a RFRA petition and (2) whether to grant a Certificate of Registration are entirely separate: "[T]he DEA's decision denying Soul Quest's petition for a religious exemption was a denial at the first step of the two-step process for obtaining permission to handle" ayahuasca's active ingredient. Maj. Op. at 30; *see also id.* at 27 (RFRA petition was merely "part one of a two-step process"). And significantly, "Soul Quest never advanced beyond the petition stage to apply for a Certificate of Registration." *Id.* at 18, n. 16. So to be clear, it's not just that the DEA's denial of Soul Quest's RFRA petition "precluded Soul Quest from *obtaining* a Certificate of Registration." *Id.* at 18 (emphasis added). Rather, it's that "[b]y denying Soul Quest's petition for a religious exemption to the CSA," the DEA effectively precluded Soul Quest from even "*applying* for registration." *Id.* at 30 (emphasis added). And if, having rejected Soul Quest's RFRA arguments, the DEA never even got to the Certificate-of-Registration stage, it certainly couldn't have "adjudicated" Soul Quest's "ultimate right to a Certificate of Registration" under the CSA. *Id.* at 34.[4]

Second, although the majority asserts that "we can conceive" of the DEA's April 2021 decision "to have been made under

---

[4] The majority seems to think that Step 1 is rooted in both the CSA and RFRA. I disagree; on my read, Step 1 derives solely from RFRA and Step 2 solely from the CSA.

22-11072          Newsom, J., Dissenting          13

*both* RFRA and the CSA," *id.* at 35, it conspicuously says almost nothing, at least in the "Discussion" section of its opinion, about the substance of the DEA's detailed, eight-page letter refusing Soul Quest's requested exemption. As I read the pertinent portion of the majority opinion, it references the agency's April 2021 letter only once, as follows: "The DEA's decision denying Soul Quest's use of ayahuasca thus conducted the analysis required by RFRA and considered factors that, under the CSA, are relevant to all applications for registration. Namely, the DEA discussed whether Soul Quest's handling of [ayahuasca's active ingredient, DMT] was 'consistent with the public health and safety' and whether Soul Quest maintained 'effective controls against diversion.'" *Id.* at 29 (quoting 21 U.S.C. § 823(b)(1), (5)). The majority seems to be suggesting that the agency's citation of those two interests was a veiled reference to the CSA's Certificate of Registration program. With respect, I think the majority is making too much of too little. As the context makes clear, the DEA cited those factors—ensuring "public health and safety" and preventing "diversion of controlled substances"—because *RFRA* makes them relevant, not because the *CSA* does. In particular, the DEA pointed to them as the "two compelling governmental interests" served by denying Soul Quest its requested exemption, and then went on to determine that denying Soul Quest's requested exemption constituted the "least restrictive means" of pursuing those aims. Doc. 59-2 at 5–7. RFRA, not the CSA, requires these determinations.

Rather than dealing with the text of the DEA's "final decision" itself—which is, all agree, the thing that must be "under" the

CSA within the meaning of 21 U.S.C. § 877—the majority focuses almost exclusively on some of the correspondence that preceded it, seemingly as a means of filling in what the agency *must* have meant. Again, though, and respectfully, that correspondence tells a different story— namely, that the DEA rendered its ultimate decision, just as its letter repeatedly said, "under" RFRA.

First came the DEA's initial letter to Soul Quest, which the agency sent in August 2016. Just as the majority says, that letter notified the church "that it may qualify for an exemption to the CSA based on"—which is to say *under*—"RFRA." Maj. Op. at 13; *accord* Doc. 13-3 at 1 (observing that the agency understood Soul Quest to be "petition[ing] for an exemption *under RFRA*" (emphasis added)). And just as the majority says, the DEA attached to that letter a copy of its RFRA Guidelines, which I've already mentioned and which explained the two-step process by which a party could "obtain an exemption *under RFRA.*" Doc. 13-3 at 4 (emphasis added).

Next came Soul Quest's petition. As the majority recounts, about a year after the DEA's initial outreach, Soul Quest formally petitioned the agency for "a religious-based exemption" to the CSA. Doc. 59-10 at 1. Notably, it did so "pursuant to"—that is to say, *under*—"the United States Supreme Court's decision in *O Centro Espirita Beneficente Uniao Do Vegetal v. Gonzalez*, 546 U.S. 418 (2006), and the provisions of the Religious Freedom Restoration Act of 1993, 42 U.S.C. §§ 2000bb, et seq." *Id.* (parentheticals omitted). Soul Quest reiterated for emphasis that its request was

"consistent with both the effect of the Supreme Court's decision in the *Gonzalez* case . . . and with the tenets of the RFRA." *Id.* at 2. It's no surprise that the DEA later called Soul Quest's request a "RFRA petition"—that's exactly what it was. Doc. 59-2 at 4 n.4.

Finally, there were the two follow-up letters that the DEA sent to Soul Quest in May and June 2020. It's true, as the majority notes, that those letters mentioned "registration" and referred to Soul Quest as a would-be "registrant." *See* Maj. Op. at 14–17, 28 (citing Docs. 59-3, 59-4). I would make two points in response. As an initial matter, there's plenty in those letters—the first, in particular—that strongly supports my conclusion that the DEA was operating "under" RFRA. The May letter, for instance, (1) stated that the DEA "look[ed] forward to opening a dialogue" with Soul Quest "to clarify the religious nature of [its] practices under the Religious Freedom Restoration Act (RFRA)," (2) recited that "[u]nder RFRA," the government may not substantially burden a person's religious exercise unless it can satisfy strict scrutiny, and (3) stated that the DEA had promulgated religious-exemption guidelines "[i]n compliance with *Gonzalez.*" Doc. 59-3 at 1–2.

Moreover, and in any event, the letters' references to the "registration" process and to Soul Quest as a would-be "registrant" don't prove much. The reason, as already explained—and as the majority repeatedly acknowledges—is that the DEA has clearly and consistently required religious-exemption seekers to secure *both* (1) a RFRA exemption *and* (2) a Certificate of Registration. *See* RFRA Guidelines at 3. So yes, Soul Quest was indeed an aspiring

"registrant," and it needed to understand the "registration" process. But to be clear, that doesn't make Soul Quest's request one for a Certificate of Registration. Soul Quest didn't frame its request that way, and the DEA didn't treat it that way. Rather, the agency took it for exactly what it was: a "RFRA petition" lodged as the first phase of the DEA's two-step process for religious exemptions.[5]

There's one last point: The majority also contends that the DEA's determination should be deemed to have been "under" the CSA because it is "entirely appropriate" for the DEA to consider RFRA in the course of applying the CSA. Maj. Op. at 32. Thus, the argument seems to go, even where, as here, the DEA forbears from enforcing the CSA due to RFRA, its decision to do so is *still* "under" the CSA. I just don't think that view is comfortably squared with the CSA's text. Recall that the CSA—indeed, the very Certificate of Registration program that the majority makes the centerpiece of its decision—expressly calls on the DEA to staunch the flow of drugs into channels "other than legitimate medical, scientific, and

---

[5] Whether the DEA is right about a religious-exemption seeker separately needing to obtain a Certificate of Registration is perhaps another matter. Once the DEA grants a RFRA exemption, it presumably can't then deny RFRA's protections on account of the church's failure to obtain a Certificate of Registration. *Cf.* 21 C.F.R. § 1307.31 (allowing "the nondrug use of peyote in bona fide religious ceremonies of the Native American Church" and clarifying that "members of the Native American Church so using peyote *are exempt from registration*" (emphasis added)). For now, though, the point is simply that the DEA views RFRA petitions as distinct from applications for Certificates of Registration. The former is not—"effectively" or otherwise—the latter.

industrial" ones.  21 U.S.C. § 823(b); *see id.* § 823(a).  On its face, that mandate would prohibit the flow of drugs into and through churches.  The CSA thus doesn't just fail to contemplate religious use of controlled substances; it expressly bans such uses.  Indeed, that's how the DEA interpreted the CSA until the Supreme Court held otherwise in *Gonzalez*.  *See* Br. of DEA at 4.  The notion that the religious-exemption program can be traced back to the CSA thus defies the statute's very text.[6]

Instead—as the DEA readily acknowledges—it's *RFRA* that "requires [the] DEA to provide individualized consideration to requests for religious exemptions," and "agencies' authority to consider *RFRA* exemption requests" is "prominently set out in *RFRA*'s plain text."  Br. of DEA at 4, 26 (emphasis added).  RFRA—not the CSA—both requires and authorizes the DEA to make religious exemptions to the CSA's provisions.

*   *   *

All of which is simply to say:  Soul Quest wasn't seeking an exemption *under* the CSA; rather, it was seeking an exemption—as the DEA acknowledged years ago and continues to tell us even

---

[6] The absence of "religious"-channel language from the CSA's scientific-medical-industrial series presumably explains why the majority doesn't cite the CSA as establishing the religious-exemption framework.  The CSA doesn't do that; RFRA does.  So to be sure, one who seeks a Certificate of Registration for a "medical, scientific, research, [or] industrial" use pursuant to § 823(a) proceeds "under" the CSA.  But just as surely, one who seeks an exemption on a ground not specified in the CSA doesn't.

now—"*from* the [CSA]." Doc. 59-2 at 1 (emphasis added); Br. of DEA at 2, 6, 7 n.1, 8, 9, 10, 15, 23, 26 (emphasis added). And the DEA decided Soul Quest's eligibility for that exemption "in accordance with"—*i.e.*, "under"—RFRA.

### III

The DEA's decision denying Soul Quest's RFRA petition had essentially nothing to do with the CSA and everything to do with RFRA. As relevant here, the CSA merely establishes the generally applicable rule that, absent an exemption, a person may not possess or use a controlled substance. RFRA carves out an exemption for those who qualify. And as the text of the DEA's decision makes plain, determinations whether a particular applicant qualifies are governed by RFRA's statutory standards and judicial decisions interpreting them. In every sense of the word, the DEA's exemption decision was made "under"—in accordance with—RFRA, not the CSA. Accordingly, 21 U.S.C. § 877, which denies federal district courts jurisdiction over challenges to DEA decisions made "under" the CSA, doesn't apply.